# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SUSAN Q. ATTENDORN,

                                Plaintiff,

        v.                                    1:12-CV-5
                                                (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.

CHARLES E. BINDER, ESQ., for Plaintiff
ELIZABETH D. ROTHSTEIN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On April 25, 2008, Ms. Attendorn ("Attendorn") protectively[1] filed an application for a period of disability and Disability Insurance Benefits ("DIB"), alleging disability beginning September 10, 2007, based upon an "affective disorder" and fibromyalgia. (Administrative Transcript ("T") at 50). Her claim was denied initially, and Attendorn requested a hearing before an Administrative Law Judge

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 404.630. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

("ALJ"). (T. 50, 70-71). Attendorn and her attorney appeared before ALJ Thomas Grabeel on March 25, 2010. (T. 34-49). On April 13, 2010, ALJ Grabeel found that Attendorn was not disabled. (T. 9-31).

Attendorn requested review by the Appeals Council of the ALJ's unfavorable decision. (T. 8). Attendorn returned to work on June 14, 2010, and by letter dated July 11, 2011, she amended her claim to assert a closed period of disability, beginning September 10, 2007, and ending June 13, 2010. (T. 227). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Attendorn's request for review on November 1, 2011. (T. 2-5).

## II. ISSUES IN CONTENTION

Ms. Attendorn makes the following arguments:

(1)     The ALJ improperly evaluated the treating physician's opinion. (Pl.'s Br. at 17-23; Dkt. No. 11).

(2)     The ALJ erred in finding Attendorn's fibromyalgia a "non-severe" impairment. (Pl.'s Br. at 23-25).

(3)     The ALJ's Residual Functional Capacity ("RFC") finding is not supported by substantial evidence. (Pl.'s Br. at 25-28).

(4)     The ALJ erred in evaluating Attendorn's credibility. (Pl.'s Br. at 28-29).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed. (Dkt. No. 12).

## III. APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence.

*Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors

justifying his findings with sufficient specificity to allow a court to determine whether

substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the

decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Williams on behalf of

Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be

"more than a scintilla" of evidence scattered throughout the administrative record.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v.*

*NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   FACTS

Attendorn's counsel has extensively stated the medical and vocational facts in his brief. (Dkt. No. 11 at 1-15). Defense counsel has incorporated plaintiff's summary, "with the exception of any inferences, arguments, or conclusions asserted therein." (Dkt. No. 12 at 2). This court will also incorporate the facts as stated by Attendorn's counsel with any exceptions as noted in the discussion below.

## V.   THE ALJ'S DECISION

The ALJ found that Attendorn had three severe impairments at Step 2 of the disability evaluation: obesity, seasonal depression, and intermittent anxiety. (T. 14). The ALJ stated that although Attendorn had also been treated for sleep apnea; a kidney stone; hyperlipidemia; hypothyroidism; headaches; fibromyalgia; and diabetes, those conditions were not "severe" because they did not cause "more than minimal limitation" on Attendorn's ability to perform basic work activities. (*Id.*)

In making this determination, the ALJ noted that Attendorn was using a

"CPAP"[2] machine for her sleep apnea and was getting "'excellent sleep at night.'" (T. 15) (quoting T. 361). Although Attendorn developed a kidney stone in February of 2008, the medical records showed that the problem was resolved with medication and without surgical intervention. (T. 15). The ALJ found that the kidney stone was no more than a "fleeting problem, of little consequence" with respect to Attendorn's ability to engage in work activities. (*Id.*) The ALJ stated that Attendorn was also treated "conservatively" for hypothyroidism, hyperlipidemia, and headaches. Her recently diagnosed diabetes was being controlled through diet alone. (*Id.*) Thus, the ALJ concluded that none of these impairments, alone or in combination would have any more than a minimal affect on Attendorn's ability to work. (*Id.*) Ms. Attendorn does not challenge these findings.

Attendorn's fibromyalgia was discussed more extensively. (T. 15-16). The ALJ found that notwithstanding Attendorn's claim that she was disabled from the symptoms of fibromyalgia, she had been treated only "conservatively" with medication, chiropractic manipulations, and injections, administered by Attendorn's primary care physician, Dr. Joyce B. Burton, D.O. (T. 15-16). The ALJ also stated that Attendorn has been repeatedly told that her symptoms would improve with weight loss and exercise. (T. 16).

The ALJ discussed Attendorn's three examinations by rheumatologist, Dr.

---

[2] "CPAP" stands for Continuous Positive Airway Pressure." http://www.webmd.com/sleep-disorders. CPAP is a type of therapy, using a machine to help a person with obstructive sleep apnea to breath more easily during sleep. *Id.* The CPAP machine increases air pressure in the throat so that the airway does not collapse when the individual breathes in. *Id.*

Donald Wexler, M.D. (T. 16). Dr. Wexler found trigger points around Attendorn's upper trapezius muscles and lumbar spine, with decreased lumbar spine flexion; however, she had a fair range of motion in her shoulders, hips, and wrists. (T. 16). Dr. Wexler found that Attendorn had "depression with associated chronic pain syndrome and "'components of fibromyalgia.'" (T. 16, 233). He concluded that Attendorn's flare-up had more to do with depression than with fibromyalgia.

The ALJ stated that Dr. Wexler did not impose any restrictions on Attendorn's physical activity, and in fact, had encouraged her to exercise and lose weight, concluding that she needed to be seen only on "an as needed basis." (T. 16, 234). The ALJ stated that Dr. Wexler's reports did not support the determination that Attendorn's fibromyalgia was a "severe" impairment as defined by the Social Security Regulations. The ALJ also found that Dr. Burton's treating notes supported the ALJ's finding and established that Attendorn's symptoms improved with weight loss and exercise.

At Step 3 of the sequential evaluation, the ALJ discussed the psychiatric review technique as required by the Regulations, evaluating Attendorn's mental impairment under the criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). The ALJ determined that the restrictions imposed by Attendorn's impairments did not meet the criteria for these listings. In addition, as required by the regulations, the ALJ stated that, notwithstanding the lack of an impairment of Listing severity, he would continue to consider the limitations imposed by all of Attendorn's impairments in determining her RFC. (T. 17-18).

At Step 4, the ALJ found that Attendorn had the RFC to perform "light work." The ALJ stated that Ms. Attendorn might have problems understanding, remembering and carrying out very detailed or complex instructions, but that she was capable of understanding, remembering, and carrying out simple instructions, consistent with unskilled work. (*Id.*) She might also have trouble sustaining attention and concentration for extended periods of time "within customary tolerances." (*Id.*) With respect to activities of daily living and social functioning, the ALJ found "mild" restrictions. He found "moderate" restrictions with regard to concentration, persistence, or pace based upon Attendorn's testimony that she needed to have things re-read to her in order to "retain" the information and upon her assertion that she was "easily distracted" and that, although she watched television all day, she did not always remember what she watched. (T. 19).

In contrast, the ALJ noted that in April 2008, Dr. Burton stated that Attendorn "continued to do research" and presented the doctor with an article to read. (T. 20, 280). Attendorn was admittedly able to focus long enough to make change, drive an automobile, read, use a computer, and do research. (T. 20). The ALJ concluded that Attendorn's reported daily activities suggested the ability to "engage in a wide range of activities, despite her impairments." (*Id.*)

The ALJ then considered Attendorn's physical impairments, including her claims of knee pain and fibromyalgia, notwithstanding his finding that neither of these impairments were "severe." The ALJ discussed medical reports that dated in 2004, three years prior to Attendorn's alleged date of onset in September of 2007. (T. 20,

8

381). The diagnosis of fibromyalgia appeared on Attendorn's 2004 records. (T. 379-82). The ALJ stated that his purpose in discussing medical records dating prior to Attendorn's onset date was to review the "longitudinal history," demonstrating the individual's attempt to seek medical treatment for pain and other symptoms and to follow that treatment once it was prescribed. (T. 21). The ALJ found that during the course of her treatment, Attendorn was "not entirely compliant" in taking her medications. She asked for substitutions when she was having success on one medication, and she often stopped taking medications on her own, sometimes stating that she felt better when she did so. The ALJ found that this type of history "suggests that [Attendorn's] symptoms may not be as debilitating as she has alleged." (T. 20).

The ALJ also found that Attendorn was not compliant with other treatment recommendations, such as the recommendation to lose weight and exercise, even though she reported a decrease in symptoms after losing very small amounts of weight. (T. 21). The ALJ found that Attendorn's credibility was also compromised because she made inconsistent statements suggesting "symptom magnification." (T. 22). He noted that Attendorn made inconsistent statements regarding the effectiveness of her medications, at one point, claiming that Ritalin kept her awake, but did not give her any energy, while also stating that she took Ritalin for "some extra energy," and telling one of her doctors that, thanks to Ritalin, she was a lot more active. (T. 22).

In making the determination that Attendorn could perform light work, the ALJ did not accord great weight to treating primary care physician, Dr. Burton's questionnaire, completed in August of 2009, that Attendorn was "totally disabled" and

would remain so "indefinitely." (T. 22-23). In finding that Dr. Burton's conclusion was not entitled to great weight, the ALJ noted that Dr. Burton's progress notes[3] from August 13, 2009 stated that Attendorn "'*continues to be very disabled per patient.*'" (T. 22) (emphasis in original). Based upon this statement, ALJ found that Dr. Burton relied heavily on Attendorn's subjective report of her own symptoms and limitations, and that the restrictions listed on Dr. Burton's "questionnaires" were inconsistent with her repeated recommendations that Attendorn engage in an exercise program. (T. 23).

Instead, the ALJ gave great weight to Dr. Kautilya Puri's consultative report, dated September 5, 2008, in which the doctor found that Attendorn had a normal gait and stance, that she had full flexion, extension, and rotary movement in her cervical and lumbar spine, a full range of motion in her hips, ankles, shoulders, elbows, forearms, and wrists. Her hand and finger dexterity were intact, and her joints were predominantly stable. (T. 23). She had a "few" trigger points at her neck and upper back with "mild" lumbosacral, cervical neck and hip tenderness. The only limitations placed on Attendorn by Dr. Puri were that she not lift heavy weights or carry out strenuous activity. (T. 23).

The ALJ then considered Attendorn's psychological assessments. (T. 24-25). The ALJ accepted the part of the consultative assessment of Dr. Kerry Brand, Ph.D. in which Dr. Brand found that Attendorn would be able to understand and follow simple directions, but did not accept Dr. Brand's other conclusion that Attendorn might have

---

[3] Dr. Burton's "progress notes" appear to be separate from the questionnaires that she completed.

some difficulty maintaining a schedule, making appropriate decisions, relating to others, and dealing with stress because "the medical record as a whole does not support such conclusions." (T. 24).

Although noting that Attendorn's therapist and licensed social worker, Diane DeGiovine was not an acceptable medical source, and rejecting her ultimate conclusion that Attendorn was "unemployable," the ALJ considered Ms. DeGiovine's letters and gave them "some weight." (T. 24). The letters stated that Attendorn had severe and persistent symptoms for the first three sessions, but by February of 2010, she had "improved considerably with treatment." (T. 24). Ms. DeGiovine stated that Attendorn was "no longer a victim of her anxiety, pain and depression." (*Id.*) She noted that Attendorn's depression and fibromyalgia were both exacerbated by winter weather. (T. 25-26).

The ALJ also mentioned that Attendorn continued to see psychiatrist Kevin W. George, M.D. and registered physician's assistant, Kenna Burns, for "medication management." (T. 25). The ALJ noted that neither of these sources had rendered an opinion on Attendorn's ability to work, but they indicated that Attendorn's anxiety, depression, lack of daytime energy, forgetfulness, and inattention had improved with medication. (T. 25).

Finally, the ALJ found that, based on Attendorn's ability to perform light work, she could return to her prior work as a convenience store/deli clerk as it is performed

in the national economy.[4] (T. 25).  The ALJ also found that Attendorn could perform her prior work as a self-employed housekeeper/maid as she previously performed the job and as performed in the national economy because the occupation does not require lifting more than ten pounds. (T. 26).

## VI.   <u>DISCUSSION</u>

### A.   **Severe Impairment**

#### 1.   **Legal Standards**

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A  severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step 2 if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work

---

[4] Attendorn could not perform this job as "she" actually performed it because she stated that when she was employed as a clerk, she was required to lift between 25 to 50 pounds, which is not consistent with light work. (T. 25).

situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3). The Second Circuit has held that the Step 2 analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps 3 through Step 5 must be undertaken. *Id.* at 1030.

Often when there are multiple impairments as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step 2 may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered

separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### 2.    Application

In this case, Attendorn argues that the ALJ erred in failing to find that Attendorn's fibromyalgia was not a "severe" impairment under the regulations.  The Second Circuit has held that, while it is recognized that fibromyalgia is a disease that eludes objective measurement,[5] mere diagnosis of fibromyalgia, without a finding as to the severity of the symptoms *and* the limitations imposed by those symptoms, does not mandate a finding of disability.  *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008).  Although the ALJ found that Attendorn's fibromyalgia was not "severe," he did find that Attendorn had other severe impairments and continued to analyze the limitations imposed by all Attendorn's impairments.  The ALJ considered the effect of fibromyalgia throughout his opinion.  Any error in finding that fibromyalgia was not severe, in itself, would have been harmless.

The court will proceed to consider Attendorn's other arguments that the ALJ erred in not giving proper weight to the treating physicians' opinions regarding the "extent" of the limitations imposed by all of the Attendorn's impairments, including fibromyalgia as well as Attendorn's argument that the ALJ erred in rejecting her

---

[5] The court notes that the Social Security Administration has issued a ruling, effective July 25, 2012 that will assist the factfinders in the evaluation of fibromyalgia. Social Security Ruling ("SSR") 12-2p.  Attendorn's counsel has submitted a copy of this new ruling with his papers. (Dkt. No. 11-1). Although not in effect when the ALJ issued his opinion, and therefore, not specifically applicable to Attendorn's case, the Ruling will assist in the analysis of fibromyalgia claims and describes the clinical techniques that are used to diagnose this impairment.

credibility regarding the intensity of her pain from fibromyalgia and regarding the extent of the limitations caused by all of her impairments.

## B.    Treating Physician

### 1.    Legal Standards

A treating physician's opinion is not binding on the Commissioner, and the opinion must be only given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 2.    Application

#### a.    Physical Impairments

Attendorn argues that the ALJ failed to give the proper weight to Attendorn's treating primary care physician, Dr. Joyce Burton, who in addition to various progress reports in the record, completed two questionnaires at the behest of Attendorn's counsel. (T. 528-32, 571-76).  The first questionnaire is dated August 13, 2009 and states, among other things, that Attendorn cannot sit for more than one hour and cannot "stand/walk" for more than one hour during an eight hour work day. (T. 530). This questionnaire also states that Attendorn had diffuse pain from fibromyalgia,

fatigue, and a major depressive disorder. (T. 529). She must move around every fifteen minutes for approximately five to ten minutes before she can resume sitting, standing, or walking. (T. 531). She can lift and carry from five to ten pounds occasionally, but is markedly limited in grasping and turning with her hands. (T. 531).

The second questionnaire is dated March 10, 2010. (T. 571-76). In this questionnaire, Dr. Burton added diabetes to the impairment list and increased the amount of time that Attendorn could sit to two hours, and the time that she could stand/walk to two hours in an eight hour day. (T. 574). Dr. Burton also stated that Attendorn had developed a "gait disturbance/antalgic gait." (T. 571). Dr. Burton continued to state that Attendorn would have to move around every fifteen minutes for approximately five to ten minutes and could occasionally lift and carry up to ten pounds. (T. 574). With respect to the ability to handle "work stress," Dr. Burton stated that Attendorn *was capable* of both low and moderate stress jobs, but stated that Attendorn could no longer perform her previous work as a care-giver because she took care of mentally retarded clients who needed constant supervision. (T. 575). Dr. Burton found that that type of job could be "stressful," and that Attendorn could no longer "physically" perform the job. (T. 575). Dr. Burton also stated that Attendorn could not push, pull, kneel, bend, or stoop, that she had "psychological limitations," and needed to avoid heights. (T. 575-76).

Attendorn argues that the ALJ should not have discounted Dr. Burton's opinion based on the doctor's allegedly "uncritical acceptance" of Attendorn's subjective complaints. Counsel also argues that the ALJ could not reject Dr. Burton's opinion

based upon (1) the scarcity of objective findings supporting Attendorn's subjective complaints; (2) Dr. Burton's recommendation that Attendorn engage in an exercise program; (3) Attendorn's statement that she thinks she would be motivated to start exercising, and/or (4) the absence of specific findings supporting Dr. Burton's statement that Attendorn had manipulative limitations. (Pl.'s Br. at 17-18).

Counsel argues that Attendorn's subjective symptoms are particularly "pertinent" because she suffers from fibromyalgia, and this impairment is "disabling." It "'eludes . . . measurement' through objective medical evidence" because there is no objective test that conclusively confirms the disease. (Pl.'s Br. at 18). Although counsel relies on *Patterson v. Astrue*, No. 7:06-CV-897, 2010 WL 3909605, at *11 (N.D.N.Y. Sept. 29, 2010), which cites *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003), the statement that fibromyalgia is "disabling," without more, overstates the holdings of these cases. In 2008, the Second Circuit stated that while it is recognized that fibromyalgia may elude objective measurement, "mere diagnosis" of fibromyalgia, without a finding as to the severity of the symptoms does not mandate a finding of disability. *Rivers v. Astrue*, 280 F. App'x at 22. *See also Crossman v. Astrue*, 738 F. Supp. 2d 300, 305 (D. Conn. 2010) (mere diagnosis of fibromyalgia is not necessarily disabling). This interpretation is supported in this case by the fact that Attendorn was being treated in 2005 for fibromyalgia, but was working at the time, and worked for two more years before she alleges that she had a "flare-up," with worsening symptoms that caused her to stop working.

The court would also point out that Attendorn's own submission references an

objective method for diagnosing fibromyalgia. (Pl.'s Br. at 19 n.26). According to the American College of Rheumatology ("ACR") guidelines, a diagnosis of fibromyalgia is supported by clinical signs and symptoms, including widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender or "trigger points." *See also* SSR 12-2p[6] (not in effect at the time of the ALJ's decision).

The ALJ did not simply reject Dr. Burton's opinion because she relied exclusively upon Attendorn's subjective complaints. The ALJ looked at the record as a whole, including reports from rheumatologist Donald Wexler, a specialist to whom Attendorn was sent by Dr. Burton.[7] (T. 16). Dr. Burton found only "some" trigger points and stated that Attendorn had "depression with some *components of fibromyalgia*." (T. 16). Dr. Wexler also recommended that Attendorn begin an exercise program, and suggested continuing her psychiatric care. (T. 16). The ALJ noted that even Dr. Burton's reports showed that Attendorn's symptoms improved with weight loss and attempts at exercise. In Dr. Burton's August 13, 2009 report, she stated that "claimant *continues to be very disabled per patient*," (T. 22, 563),[8] implying that it was Attendorn, and not Dr. Burton, who was making the determination that Attendorn was "disabled." (emphasis in original).

---

[6] Other objective methods of diagnosing fibromyalgia are listed in this ruling.

[7] The ALJ discussed Dr. Wexler's report in the section of his opinion relating to whether the fibromyalgia was a "severe" impairment, but clearly, this discussion was also relevant to an analysis of the "severity" of Attendorn's symptoms later in the five-step evaluation.

[8] The court notes that this is the same day that Dr. Burton stated she was completing paperwork for "[Attendorn's] disability." (T. 563). According to Dr. Burton, one month later, Attendorn looked better than she had for the past two years. (T. 565).

Attendorn argues that the ALJ should not have used Dr. Burton's suggestion that Attendorn engage in an exercise program to reject the restrictions listed in the questionnaires. However, if Ms. Attendorn was as restricted as the questionnaires indicated, she would not have been able to engage in an exercise program. The court also finds that the ALJ was correct in stating that the restrictions that Dr. Burton placed upon Attendorn's *manipulative* abilities are inconsistent with Dr. Puri's report, and are not supported by any objective evidence in the record.

On September 5, 2008, Dr. Puri found that Attendorn's hand and finger strength and dexterity were intact, and her grip strength was 5/5 bilaterally. (T. 453). This finding is inconsistent with the statement in Dr. Burton's questionnaire that Attendorn would have "marked" limitations grasping, turning, or twisting objects, (T. 531), but was much more consistent with Dr. Burton's progress notes, dated July 17, 2008, in which Dr. Burton stated that Attendorn was the best that Dr. Burton had seen her, and that she was "doing a lot more." (T. 437). Dr. Burton's November 13, 2008 progress notes are also more consistent with Dr. Puri's report than with Dr. Burton's very restrictive questionnaire. On November 13, 2008, Dr. Burton stated that overall, Attendorn was feeling "very well," although she was beginning to have more problems due to the colder weather. (T. 440). Dr. Burton stated that *Attendorn* did not feel that she could go back to work because she could not sit or stand long enough. (*Id.*)

Dr. Puri also found only a "few" trigger points at Attendorn's neck and upper back. (T. 23). Dr. Puri noted that Attendorn's cervical and lumbar spine showed full flexion, extension, lateral flexion, and rotary movement bilaterally. (T. 453). Straight

leg raising was negative bilaterally, she had full range of motion in her shoulders, elbows, forearms, and wrists. There was full range of motion of her hips, knees, and ankles bilaterally. In addition to the full grip strength noted above, Attendorn's strength was 5/5 "in upper and lower extremities." (*Id.*) Attendorn's joints were stable and nontender, except for "mild lumbosacral, cervical neck muscles, and bilateral hip tenderness and bilaterally tenderness on palpation and movement." Dr. Puri did not find any muscle atrophy. (T. 453).

Dr. Puri suggested that Attendorn not lift *heavy* weights or engage in "strenuous" activity. (T. 454). While Attendorn argues that this finding is vague, Dr. Puri's examination of Attendorn was very thorough and is also consistent with Dr. Burton's progress notes dated January 13, 2009 and September 25, 2009. (T. 515, 565). January 13, 2009 was the date of Attendorn's annual physical, and Dr. Burton stated that Attendorn was feeling more stable and better than she had in quite some time, that she had purchased a light box,[9] and that she was to continue her efforts to lose weight. (T. 515).

On August 25, 2009, Dr. Burton wrote to Attendorn's counsel, stating that plaintiff could not sit or stand for any prolonged period and that her medications did not result in remission. (T. 539). Dr. Burton stated that the plaintiff was "totally disabled and [this] will last indefinitely." (*Id.*) One month later, Dr. Burton wrote in

---

[9] A "light box" is device that emits light, mimicking outdoor light. *See* http://www.mayoclinic.com/health/seasonal-affective disorder-treatment/DN00013. Light box treatment may be effective on its own, but is also used in conjunction with medication and/or counseling. *Id.* The light from a light box is thought to cause a chemical change in the brain that lifts mood and eases other symptoms of seasonal affective disorder. *Id.*

Attendorn's progress notes that Attendorn told the doctor that she was "doing quite well" with Savella, and Dr. Burton stated that plaintiff "looks so much better today than she has in the past two years." (T. 565). In the section entitled "Assessment and Plan" of her progress notes, Dr. Burton stated that Attendorn's Fibromyalgia was "improved," and that she should reconsider her appointment with Dr. Argoff,[10] "since her pain is better." (*Id.*) Finally, Dr. Burton stated that Attendorn was making strides in weight loss. (*Id.*) Thus, the ALJ's failure to give controlling weight to Dr. Burton's extremely restrictive limitations is supported by substantial evidence because the restrictions are inconsistent with the record as a whole and with Dr. Burton's own contemporaneous reports.

### b. Mental Impairments

The ALJ found that Attendorn had the severe impairments of "seasonal depression" and "intermittent anxiety." (T. 14). The ALJ rejected the part of consultative physician, Dr. Brand's report, in which it stated that Attendorn would have "some difficulty" learning new tasks and performing tasks independently and might have some difficulty maintaining a schedule, making appropriate decisions, relating to others, and "dealing with stress." (T. 24). The ALJ concluded that these opinions were not supported by the medical record "as a whole." (*Id.*)

The law is clear that the ALJ cannot pick and choose only the parts of the record

---

[10] Dr. Argoff worked at the Albany Pain Clinic. (T. 563). In Dr. Burton's August 13, 2009 progress notes, her plan included referring Attendorn to Dr. Argoff. (*Id.*) One month later, Dr. Burton stated that Attendorn was doing so well, she should consider whether to meet with Dr. Argoff. (T. 565).

that support his determination, without affording consideration to the evidence supporting the plaintiff's claims. *Credle v. Astrue*, No. 10-CV-5624, 2012 WL 4174889, at *17 (E.D.N.Y. Sept. 19, 2012) (citing *Stewart v. Astrue*, No. 10-CV-3032, 2012 WL 314867 (E.D.N.Y. Feb. 1, 2012)). However, the ultimate determination of whether a plaintiff is disabled or "unable to work" is reserved to the Commissioner. *Id.* (citing 20 C.F.R. § 404.1527(d)). The Commissioner considers the data provided by physicians, but draws his own conclusions as to whether the data supports a finding of disability. *Id.* (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

Unlike cases in which the ALJ selected portions of a physician's report, while *ignoring* other portions of the report to the plaintiff's disadvantage,[11] the ALJ in this case cited the evidence from Dr. Brand's opinion that supported Ms. Attendorn's claim,[12] but then explained the reasons why he found that, to the extent Dr. Brand's opinion questioned Attendorn's ability to concentrate, it was not supported by the record as a whole. (T. 19, 22-25).

The ALJ did not completely reject Attendorn's alleged difficulty maintaining a schedule and concentrating, rather, he simply questioned the extent of the limitation.

---

[11] *See e.g.*, *Menard v. Astrue*, No. 2:11-CV-42, 2012 WL 703871, at *6 (D. Vt. Feb. 14, 2012) (the ALJ cited doctor's note that plaintiff was "'busy doing yard work and things around the house,'" but failed to mention that in the same report, the doctor noted that plaintiff was "feeling crappy;" that his shoulder hurt; he was getting tingling in his fingers; his hands felt stiff; and his hands had been uncontrollably jerking up in the air); *Rich v. Comm'r of Soc. Sec.*, No. 2:11-CV-85, 2012 WL 209030, at *5 (D. Vt. Jan. 24, 2012) (ALJ gave weight only to statement that plaintiff was progressing toward her goals, without considering that there were other treatment notes describing severe symptoms).

[12] In fact, the ALJ discussed almost all of Dr. Brand's opinion. (T. 23-24).

When the ALJ discussed the psychiatric review technique, he stated that "[w]ith regard to concentration, persistence, or pace, the claimant has moderate difficulties." (T. 19). Notwithstanding these moderate difficulties, Attendorn was still able to make change, drive, read, use a computer, and "even carry out research." (T. 20). The ALJ pointed out that in April of 2008, Dr. Burton reported that Attendorn continued to do research on her impairment, and brought an article for Dr. Burton to read. (T. 20). Attendorn occasionally made her own medication recommendations, stopped taking medications, or changed the dosage amount on her own. (*Id.*) Thus, the ALJ's properly gave less weight to the part of Dr. Brand's report implying that Attendorn's problems with concentration or scheduling would prevent her from performing her previous work.

The ALJ also considered the reports written by Social Worker, Diane DeGiovine, who although not an "acceptable medical source" for *establishing the existence of an impairment*, may be considered in determining the severity of a plaintiff's symptoms. (T. 24). The ALJ noted that Attendorn began seeing Ms. DeGiovine in April 2008 for counseling. Attendorn saw Ms. DeGiovine six times, and although Ms. DeGiovine's initial reports found severe and persistent symptoms, Attendorn improved in the first three sessions to "moderate" symptoms, and by February 6, 2010, Ms. DeGiovine stated that Attendorn's depressive symptoms had improved "considerably with treatment." (*Id.*) Ms. DeGiovine concluded that Attendorn was no longer a victim of her anxiety, pain and depression. (T. 24).

At the same time, the ALJ noted that Ms. DeGiovine found that Attendorn was

"unemployable" due to chronic pain, (T. 25), but the ALJ correctly stated that the ultimate decision of whether a plaintiff was disabled was reserved to the Commissioner.  The ALJ *justifiably* chose portions of Ms. DeGiovine's report to give "some weight" and gave "no weight" to her ultimate opinion that Attendorn was "unemployable."

### D.    Residual Functional Capacity (RFC)/Past Relevant Work/Credibility

#### 1.    Legal Standards

##### a.    RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17,

2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

## b. Past Relevant Work

Once the ALJ determines plaintiff's RFC, the ALJ must then determine at Step 4 of the disability determination, whether plaintiff can perform her past relevant work. The ALJ compares plaintiff's RFC with the duties of the specific job as plaintiff previously performed it and the functions and duties of the job as it is performed in the national economy. *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981); SSR 82-62, 1982 WL 31386 (SSA 1982)). Plaintiff carries the burden to show that she cannot perform either type of work. *Id.*

## c. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical

evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

### 2.    Application

Because this court has determined that the ALJ's analysis of the treating physicians' opinions is supported by substantial evidence, the court need only consider whether the ALJ properly articulated Ms. Attendorn's RFC according to the regulations, and in doing so, whether the ALJ properly analyzed plaintiff's credibility. In determining that Attendorn could return to her prior work, the ALJ also found that

her own statements regarding her physical and mental limitations were not credible to the extent that they were inconsistent with the ability to perform light work.

In his decision, the ALJ carefully covered all Ms. Attendorn's mental limitations according to the psychiatric review technique. (T. 19-20). He concluded that Ms. Attendorn's reported daily activities, social life, and admitted capacity to perform activities requiring concentration and persistence, showed that she had the ability to perform a wide range of activities, despite her impairments. (T. 20).

The ALJ relied on Dr. Puri's recommendation that Attendorn avoid lifting heavy weights or engaging in *strenuous* activities. Dr. Puri did not put any restriction on her ability to sit, stand, or walk. These statements supported the ALJ's determination that Ms. Attendorn could engage in the physical functions required for light work: the ability to lift up to ten pounds frequently and twenty pounds occasionally, together with the ability to do either a "good deal" of walking or standing, or to sit most of the time with some pushing or pulling of arm controls. *See Garber v. Astrue*, No. 1:10-CV-845, 2012 WL 1069017, at *9 & n.11 (N.D.N.Y. Mar. 2, 2012) (finding no requirement that consultative findings be stated in terms that correlate directly to a plaintiff's RFC because it is up to the ALJ, not the physician, to assess the plaintiff's exertional capabilities on a function-by-function basis, as long as the consultative physician's opinion is not so vague as to render it useless), *adopted by* 2012 WL 1069014 (N.D.N.Y. Mar. 29, 2012); 20 C.F.R. § 404.1576(b) (requirements of light work).

In making the RFC determination, the ALJ also considered Ms. Attendorn's

credibility. While objective evidence established the existence of plaintiff's impairments, the ALJ found that plaintiff's claims as to the intensity and limiting effects of those impairments were not supported by the record. The ALJ found that Ms. Attendorn's credibility was "compromised" because of inconsistent statements about the effectiveness of her medications (T. 22), based on her lack of compliance with medications (T. 20), and based upon the "longitudinal history" of her treatment, even before her alleged onset date (T. 21). The ALJ did not believe that Ms. Attendorn's pain was as intense as she claimed, and found that her pain did not preclude her from performing her prior work in some capacity.

The consideration of records dating prior to a plaintiff's onset date is authorized by the Social Security Rulings. SSR 96-7p. *See Cardoza v. Astrue*, No. 3:10-CV-1951, 2012 WL 3727160, at *7-8 (D. Conn. April 13, 2012) (in determining credibility, the ALJ may consider plaintiff's treatment history, including gaps in the treatment record and compliance with treatment once it is prescribed) (Report-Recommendation) (citing *inter alia Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir. 1992) (finding that a claimant's failure to follow prescribed treatment contradicted subjective evidence of pain); *Taylor v. Astrue*, No. 3:09-CV-1049, 2010 WL 7865031, at *11 (D. Conn. Aug. 31, 2010) (failure to seek treatment and/or failure to follow prescribed treatment are relevant considerations in the determination of credibility).

In this case, the ALJ noted that Ms. Attendorn has been told since prior to her onset date that she must lose weight, and when she has lost weight, her symptoms have improved. (T. 21). The ALJ stated that after plaintiff began using her CPAP in

the beginning of 2006 machine, she "felt like a million bucks," she had an increase in energy, lost weight, and in four months she was able to use the treadmill every day. (T. 21). She felt so much better, that she stopped taking some of her medications. (*Id.*) However, by August of 2006, Attendorn had "slacked off" on her exercise, gained weight, and reported worsening fibromyalgia symptoms. Dr. Burton reminded Ms. Attendorn that extra fat carried estrogen that could be making her moods worse. (T. 21). By 2009, after Ms. Attendorn was diagnosed with diabetes and had a "wake up call," she lost nine pounds, and Dr. Burton stated that she looked better than she had in two years. The ALJ properly found that the "record shows the claimant's symptoms improved significantly when she complied with medical recommendations to lose weight and exercise." (T. 21).

In 2007, specialist, Dr. Wexler also told plaintiff to start some type of aerobic activity *on a regular basis* because "[t]his will help with her symptoms. (T. 234). Dr. Wexler stated that he reassured Ms. Attendorn that there was "no evidence of any inflammatory arthritis or any significant degenerative disease." Attendorn was to be seen subsequently "only on a prn basis." (T. 234). In February of 2008, Dr. Burton's notes indicate that plaintiff took a trip to Ohio, even though she complained that she did more that she should have, "but honestly, she looks quite good." (T. 359). The ALJ's conclusion that plaintiff had pain, but it was not severe enough to preclude light work is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and

the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have

**FOURTEEN (14) DAYS** within which to file written objections to the foregoing

report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 2, 2012

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**